Docket No. 88306–Agenda 16–September 2000.

CALLIS, PAPA, JACKSTADT & HALLORAN, P.C., Appellee,

v. NORFOLK AND WESTERN RAILWAY COMPANY,

 Appellant.

Opinion filed April 19, 2001.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Callis, Papa, Jackstadt & Halloran, P.C. (hereinafter, the law firm), sought injunctive relief in the circuit court of Madison County against defendant, Norfolk and Western Railway Company
(footnote: 1) (hereinafter, the railroad). The circuit court granted a preliminary injunction, and the railroad appealed. In a summary order, the appellate court affirmed the circuit court’s judgment. No. 5–98–0756 (unpublished order under Supreme Court Rule 23). The railroad then filed a petition for leave to appeal (177 Ill. 2d R. 315(a)), which this court granted. For the reasons that follow, we now reverse the judgment of the appellate court.

BACKGROUND

The parties do not dispute the essential facts in this matter. The railroad is a corporation that operates trains and maintains track, rolling stock, and equipment in the southern Illinois region. Thomas R. Rush is a conductor in defendant’s employ. Rush is a member of the United Transportation Union (UTU), and his employment is governed by a collective-bargaining agreement between the railroad and the UTU, as well as by the provisions of the federal Railway Labor Act (45 U.S.C. §151 
et seq.
 (1994)). Under the terms of the collective-bargaining agreement, the railroad may only discipline a covered employee such as Rush after first conducting a fair and impartial investigation. In accordance with the agreement, an accused employee must be given written notice of the charges against him. The employee has the right to a hearing, at which he may have witnesses appear and testify on his or her behalf. At the hearing, the employee is permitted to be represented by a union official, but both the employee and the railroad are barred from having attorneys participate in the proceedings. The employee may appeal any discipline imposed through the established grievance procedure. If such an appeal is not resolved to the employee’s satisfaction, the employee or the union representative may submit the dispute to arbitration as provided under the Railway Labor Act.

While on duty on August 12, 1998, Rush fell, landing on his right buttock and right leg. He declined the medical treatment offered by defendant’s personnel and continued with his work. Several days later, Rush informed M.J. Wheeler, the railroad’s assistant superintendent of terminals, that he was experiencing occasional pain. Rush requested to see a doctor and was transported to a health care center, where he was examined by Dr. Cheryl Patterson, who diagnosed the injury as a bruise to the right buttock and a strain to the right hamstring. Dr. Patterson prescribed over-the-counter ibuprofen and released Rush for return to full work duty.

On September 1, 1998, at approximately 3:40 p.m., the railroad’s superintendent of terminals, D.L. Williams, spoke with Rush over the telephone. Williams asked Rush how he was feeling. Rush stated that he had not gotten any better. Rush explained that he was limping around on the job and was not able to perform his assignments. Williams told Rush that the railroad had scheduled a doctor’s appointment for him at 10 a.m. the following day.

Approximately one hour after the phone conversation between Williams and Rush, Assistant Superintendent Wheeler observed Rush on duty from 5 to 6:15 p.m. During this period, Rush apparently was unaware of Wheeler’s presence. Wheeler observed Rush throw approximately 10 to 12 switches and walk back and forth between switches at a brisk pace. Wheeler also saw Rush set and release handbrakes by mounting and dismounting tank cars. Wheeler watched Rush perform these tasks without any apparent difficulty and without any noticeable limp. At approximately 6:45 p.m., Wheeler saw Rush once more, with Rush again apparently unaware of Wheeler’s presence. Rush performed tasks without a discernible limp and without difficulty. As Rush rounded the front of a locomotive, he saw Wheeler. At that point, he began to walk with a limp. Wheeler asked Rush how he felt. Rush stated that his leg was not getting any better. Wheeler thereafter reported his observations to Williams.

On the next day, September 2, Williams spoke with Rush at the clinic following the scheduled doctor visit. Rush limped and walked very slowly in Williams’ presence. At the conclusion of the conversation, at 10:30 a.m., Williams informed Rush that he was taking Rush out of service because Williams had reason to believe that Rush was being dishonest about the extent of his physical condition and his ability to perform his duties. Williams intended that a complete factual record on this issue be developed so that the railroad could determine whether Rush had, in fact, engaged in conduct unbecoming a railroad employee and whether it would be appropriate to discipline him if such conduct were to be found to have occurred. The investigation was to be conducted pursuant to, and in accordance with, the collective-bargaining agreement.

At some point after the 10:30 a.m. conversation, Rush contacted the law firm. Later that afternoon, Lance Callis of the law firm wrote a letter to the railroad informing it that the firm had been retained by Rush to represent him “in a claim for damages” as a result of the August 12 accident. The letter advised the railroad that the law firm was claiming a reasonable contingent fee of any sums recovered by Rush. The letter closed by asking the railroad to “have no further contact with [Rush].”

On the next day, September 3, 1998, Superintendent Williams wrote a letter to Rush on behalf of the railroad, informing Rush in writing of the charges under investigation. According to the letter, the purpose of the investigation was “to determine [Rush’s] responsibility, if any, in connection with conduct unbecoming a [railroad] employee in that [Rush] made false statements concerning the extent of [his] physical condition subsequent to an alleged personal injury at approximately 3:45 p.m. on Tuesday, September 1, 1998.” The railroad scheduled the hearing to be held on September 9, 1998. The letter further identified three persons as witnesses and advised that others might be called.

On September 8, 1998 the law firm filed a verified complaint for injunction and temporary restraining order. In the complaint, the law firm alleged that, on September 2, 1998, it had entered into a contractual relationship with Rush and had determined that Rush had a claim against the railroad under the Federal Employers’ Liability Act (FELA) (45 U.S.C. §51 
et seq.
 (1994)). The law firm further alleged that it had filed a complaint against the railroad in the circuit court of Madison County.
(footnote: 2) According to the law firm, the disciplinary hearing scheduled by the railroad would subject Rush to questioning by railroad representatives concerning the accident for which the law firm represented Rush. The law firm claimed that the railroad was “attempting to question Rush outside the presence of his attorneys concerning the subject matter for which [the law firm] represents Rush in a separate action filed under the FELA.” The law firm alleged that, unless restrained by the court, the railroad would interfere with the contractual relationship between the law firm and Rush and would interfere with the law firm’s prospective economic advantage by forcing Rush to either subject himself to questioning and provide information regarding his FELA suit, without the firm’s assistance, or risk immediate dismissal for failure to do so. This action, the law firm alleged, would cause it immediate and irreparable harm.

The law firm further claimed that the railroad’s action would subject the law firm to immediate and irreparable harm due to the fact that the law firm had an ethical and contractual duty to represent its client fully and zealously. According to the firm, if the railroad were allowed to question Rush, then the law firm would be subject to potential malpractice and ethical charges. The law firm stated that the railroad’s actions would harm the law firm due to the fact that the firm “had a prospective economic advantage” because of its employment relation with Rush. Moreover, the firm claimed that the railroad’s attempt to interrogate Rush outside the presence of, and without the law firm’s counsel, “would interfere with the firm’s prospective economic advantage by preventing the law firm’s legitimate expectancy from ripening into a valid business relationship.” The law firm requested that the circuit court enter a temporary restraining order against the railroad and that the order be made permanent upon a final hearing.

The circuit court entered a temporary restraining order on the same day the verified complaint was filed. The court also set the matter for a preliminary injunction hearing, to be held one week later.

The railroad filed a memorandum in opposition to the law firm’s application for a preliminary injunction. In it, the railroad maintained that the law firm failed to meet the requirements for a preliminary injunction because the allegations in the verified complaint did not establish the likelihood of the tortious interference claim’s success on the merits. In response, the law firm argued that the railroad’s position was not supported by Illinois law. The law firm cited to a decision of the appellate court, 
Callis, Papa, Jensen, Jackstadt & Halloran, P.C. v. Norfolk Southern Corp.
, 292 Ill. App. 3d 1003 (1997) (
Callis I
), in support of its cause of action. In that case, a Fifth District panel of the appellate court considered facts similar to the those advanced in the instant case and concluded that, under the circumstances, injunctive relief, based upon tortious interference, was proper.

At the hearing, the circuit court took judicial notice of the entire circuit court file in 
Callis I
, including the pleadings and transcripts. The court granted the law firm a preliminary injunction in an order dated October 21, 1998. The court found that the law firm had established a clearly ascertained right in need of protection, a likelihood of success on the merits, and a lack of privilege. The court ruled that the law firm would suffer irreparable harm if the injunction did not issue and that the law firm lacked an adequate remedy at law. The railroad appealed. The appellate court affirmed the circuit court’s order in an unpublished summary order, holding that the case at bar was indistinguishable from the issues and facts previously addressed in 
Callis I
.

As noted above, this court allowed the railroad’s petition for leave to appeal. We subsequently granted the following organizations leave to submit briefs as 
amici curiae
: the Association of American Railroads, the Academy of Rail Labor Attorneys, and the Illinois Trial Lawyers Association. 155 Ill. 2d R. 345. Prior to oral argument, but after briefing in the matter had been concluded, the law firm moved to dismiss the appeal as moot. In its motion, the law firm indicated that the FELA litigation between Rush and the railroad had been settled and that Rush’s complaint had been dismissed with prejudice. As such, the law firm contended that a real controversy between the parties no longer existed and that none of the exceptions to the mootness doctrine existed so as to allow appellate review. See 
Madison Park Bank v. Zagel
, 91 Ill. 2d 231 (1982). The railroad objected to the motion, arguing that the case should be reviewed notwithstanding the settlement because it presented (i) a question of public interest, (ii) an issue in need of authoritative determination for future guidance, and (iii) a situation likely to recur. This court denied the law firm’s motion on August 22, 2000.

ANALYSIS

We begin our discussion by first addressing a point of appellate procedure raised by the law firm. In its brief, the law firm notes that the circuit court based its ruling on the “entire record,” including the “case and contents of the case file 
Callis, Papa, Jenson, Jackstadt, & Halloran, P.C. v. Norfolk Southern Corp.
, 96 CH 253.” However, the law firm points out that the record on appeal does not contain these 
Callis I
 materials and argues that the railroad has presented an “incomplete record of the matters considered by the circuit court in exercising its discretion to grant the preliminary injunction.” The law firm accordingly suggests that we employ a presumption, utilized on appeal where the record is incomplete, that the circuit court’s ruling was in conformity with the law and had a sufficient factual basis. We decline the law firm’s suggestion.

Supreme Court Rule 321 governs the contents of the record on appeal. The rule provides that the record shall consist of “the judgment appealed from, the notice of appeal, and the entire original common law record, unless the parties stipulate for, or the trial court *** orders less.” 155 Ill. 2d R. 321. The “common law record” includes every document filed, as well as every judgment and order entered in the cause, along with any documentary exhibits offered and filed by any party. 155 Ill. 2d R. 321. The record also includes any report of proceedings prepared in accordance with Rule 323. 155 Ill. 2d R. 321.

Our examination of the record on appeal reveals that every document filed by the parties, along with all orders of court, were included in the record that is now before us. With respect to the Callis file to which the law firm refers, we note that it was the law firm that asked the circuit court to take judicial notice of the case. In so doing, the law firm, however, did not file, with the circuit court, a copy of the documents which constituted the entire 
Callis I 
case file. Thus, fault for the case file’s omission from the common law record lies not with the railroad but rather with the proponent of the evidence. In any event, the 
Callis I
 case file is a public document, capable of being readily verifiable. Therefore, this court will, as did the circuit court, take judicial notice of it. See 
People v. Henderson
, 171 Ill. 2d 124, 134 (1996).

The dispositive issue for our review is whether the circuit court properly granted preliminary injunction relief to the law firm. The purpose of a preliminary injunction is to preserve the status quo pending a decision on the merits of a cause. 
Hartlein v. Illinois Power Co.
, 151 Ill. 2d 142, 156 (1992). This court, like others, has viewed a preliminary injunction as an extreme remedy which should be employed only in situations where an emergency exists and serious harm would result if the injunction is not issued. See 
Buzz Barton & Associates, Inc. v. Giannone
, 108 Ill. 2d 373 (1985) (and cases cited therein). A party seeking a preliminary injunction must establish that (i) a clearly ascertained right in need of protection exists, (ii) irreparable harm will occur without the injunction, (iii) there is not an adequate remedy at law for the injury, and (iv) there is a likelihood of success on the merits. 
Hartlein
, 151 Ill. 2d at 156; 
In re Adoption of Scraggs
, 125 Ill. 2d 382, 388 (1988).

On appeal, a reviewing court examines only whether the party seeking the injunction has demonstrated a 
prima facie
 case that there is a fair question as to the existence of the rights claimed. The decision to grant or deny a preliminary injunction rests within the sound discretion of the trial court, and, on review, the decision will not be disturbed absent abuse of discretion. Stated differently, the only question before the court of review is whether there was a sufficient showing to sustain the order of the trial court. See 
Dixon Ass’n for Retarded Citizens v. Thompson
, 91 Ill. 2d 518, 524-25 (1982).

The circuit court in this case found that the law firm had established a clearly ascertained right in need of protection in that the law firm’s ability and right to perform its contractual duty to Rush had been threatened by the impending disciplinary hearing. The court found that the law firm would be “physically restrained or be excluded from the place where it would perform its contract of representation” and that such conduct on the part of the railroad constituted “wrongful interference” with the professional relationship. The court also found that irreparable harm would occur absent an injunction because “nothing could be done to restore the status quo should the railroad be allowed to proceed with its interrogation of the client, 
ex parte
.” Finally, the court found that there was no other remedy at law which would “undo” the damage done by such an interrogation and that “nothing short of preventing the interrogation, could make [the law firm] whole.”

 In essence, the circuit court applied to this case the same analysis set forth by the appellate court in 
Callis I.
 Indeed, on appeal, the circuit court’s order was summarily affirmed by a panel of the Fifth District after it concluded that this case is virtually indistinguishable in both fact and in law from 
Callis I
. Therefore, the propriety of the lower courts’ actions in this case is largely dependent upon the correctness of 
Callis I
.

In 
Callis I
, the law firm sought a preliminary injunction in order to enjoin the railroad from holding the disciplinary hearing provided for in the collective-bargaining agreement. The facts of the case are similar to those at bar. The railroad employee was injured at work on August 21, 1996. Six days later, he retained the services of the law firm. On August 30, the railroad notified the employee by letter of the disciplinary hearing. On September 4, the railroad became informed of the law firm’s retention. One day later, the law firm filed suit to enjoin the scheduled disciplinary hearing, arguing that the railroad was interfering with the contractual relationship that existed between the employee and the law firm. The circuit court granted the injunction.

On appeal, the appellate court concluded that the law firm properly and adequately pleaded a cause of action under Illinois law for intentional interference with the attorney-client relationship. 
Callis I
, 292 Ill. App. 3d at 1010. The court stated that the action “is a species of the tort of intentional interference with prospective economic advantage.” 
Callis I
, 292 Ill. App. 3d at 1010. In so holding, the appellate court rejected the railroad’s contention that the claim was based upon the rights of the employee rather than the rights of the law firm as the employee’s attorney. The court recognized that the law firm had a protectable interest in its professional relationship with its client and that the action was brought to vindicate the law firm’s rights and not the client’s rights. Moreover, the court stated that under the tort of interference with prospective economic advantage, neither a breach nor a termination of contract is an element of the cause of action. 
Callis I
, 292 Ill. App. 3d at 1012. According to the court, if the hearing were to be held and the employee were to be unrepresented by counsel, then the law firm’s performance of its obligations as attorney would be impaired or prevented. Relying on section 766A of the Restatement (Second) of Torts, the appellate court noted a contract may be interfered with when the actor is excluded “from the place of performance.” 
Callis I
, 292 Ill. App. 3d at 1012-13. In rejecting the railroad’s claim of privilege, 
i.e.
, the railroad was entitled to hold the hearing under the collective-bargaining agreement, the appellate court concluded that an alleged tortfeasor should not be granted a privilege “to engage in an activity that is designed to both intimidate the client and prevent the client’s attorney from performing a basic duty, 
i.e.
, being present when his client is questioned by the alleged tortfeasor.” 
Callis I
, 292 Ill. App. 3d at 1013. The appellate court further held that the law firm’s cause of action was not preempted by the terms of the Federal Railway Labor Act and that the railroad had waived its contentions regarding irreparable harm and adequate remedy at law because it failed to comply with Supreme Court Rule 341(e)(7). 
Callis I
, 292 Ill. App. 3d at 1013-16.

As it did in its complaint, the law firm, in its brief, speaks in terms of protecting its “prospective economic advantage.” We note that the firm has sought injunctive relief on the basis of the tort of intentional interference with prospective economic advantage as recognized in 
Callis I
. We agree with the lower courts that the facts and issues presented in this case are similar to, if not identical to, those present in 
Callis I
. Nevertheless, we disagree with the analysis employed by the appellate court in its opinion.

As an initial matter, we note that the conclusion in 
Callis I
 that the law firm properly and adequately pleaded a cause of action under Illinois law for intentional interference with the attorney client relationship belies the need for equitable relief. See 
Hartlein
, 151 Ill. 2d at 156 (discussing no adequate remedy at law). Nevertheless, even if we were to agree that the tort could somehow serve as a predicate for the injunctive relief sought, we do not believe that tort has been established under the circumstances present in this case.

The relationship between the law firm and Rush is a contractual, at-will relationship. Until such a relationship is terminated, the at-will contract is of value to the law firm; thus, intentionally causing the termination of an at-will contract, without just cause, is an actionable tort. See 12 Ill. Jur. 
Interference with Rights
 §14:8 (1994). In Illinois, four elements are needed to establish the tort: (i) the plaintiff’s reasonable expectation of entering into a valid business relationship, (ii) the defendant’s knowledge of the plaintiff’s expectancy, (iii) the purposeful interference by the defendant that prevents the plaintiff’s legitimate expectancy from ripening into a valid business relationship, and (iv) the damages to the plaintiff resulting from such interference. 
Fellhauer v. City of Geneva
, 142 Ill. 2d 495, 511 (1991). In the context of attorney-client relationships, recovery has been allowed or a complaint has been held sufficient when “it was either alleged or shown that the client was induced by or conspired with the defendant to breach or terminate his contract with an attorney, thus depriving the attorney of compensation.” 
Herman v. Prudence Mutual Casualty Co.
, 41 Ill 2d 468, 474-75 (1969) (collecting and discussing cases). Moreover, an attorney, in order to prevail, must “show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but ‘purposeful interference’–that the defendant has committed some impropriety in doing so.” 
Dowd & Dowd, Ltd. v. Gleason
, 181 Ill. 2d 460, 485 (1998), quoting Restatement (Second) of Torts §766B, Comment 
a
 (1979).

We fail to see how the law firm’s allegations established that the railroad’s action prevents or will prevent the law firm’s legitimate expectancy from ripening into a valid business relationship and that damages will be suffered as a result thereof. Nothing the railroad has threatened to do has caused Rush to sever or alter, in any way, the contractual relationship he has with the law firm. Contrary to the view expressed by the circuit court, the holding of a disciplinary hearing does not render the law firm’s FELA representation impossible to perform. The railroad’s holding of the disciplinary hearing does nothing to deny the law firm’s ability to represent Rush in the FELA action. In other words, the railroad’s action does not serve to close, unlawfully, the doors to any court in this state. The railroad’s actions have not stopped the law firm from filing its FELA action, nor have they prevented the firm from going ahead with that litigation.

We emphasize that the law’s firm contractual relationship with Rush is based upon its representation of Rush in the FELA proceeding, not in the disciplinary proceeding. The law firm has not been excluded from any FELA proceeding. Rather, the law firm has been precluded only from being present at the disciplinary proceeding. This exclusion is not due to the unilateral, wrongful action of the railroad, but is the result of the bilateral agreement between the railroad and its employee, Rush. As this court stated many years ago, “in the absence of factual allegations that the [attorney retainer] employment contracts were breached or terminated with resulting damage to plaintiffs, the complaint fails to state a cause of action for damages for malicious interference with contract.” 
Herman
, 41 Ill. 2d at 477. Therefore, we do not believe that the law firm made a sufficient showing to sustain the circuit court’s granting of preliminary injunctive relief.

Moreover, to the extent that the law firm argues it has a clearly ascertainable right to be able to perform its contractual duties to Rush, the law firm has not established the irreparable harm required for injunctive relief. In this regard, we disagree with the appellate court’s conclusion in 
Callis I
 that the railroad’s actions will unlawfully cause the firm’s performance of its obligations as attorneys to be impaired or prevented. The gist of the law firm’s claim in this case is that the law firm is concerned that the railroad will secure, during the course of the disciplinary hearing, some evidence that will render the FELA litigation more difficult for the law firm to prosecute. The law firm and its 
amici
 warn that an employee could even be fired as a result of such a proceeding and the fact of such a firing would serve to diminish the damages that would otherwise be assessed against the railroad in the FELA case.

Whether or not the disciplinary hearing would even produce the prejudicial evidence claimed by the law firm or a termination of the employee is a matter of pure speculation. Courts have long adhered to the notion that the right to injunctive relief rests on actual or presently threatened interference with another’s rights. Generally, the damage sought to be enjoined must be likely and not merely possible. “Injunctive relief will not be granted merely to allay the fears and apprehensions or to soothe the anxieties of the parties.” 42 Am. Jur. 2d 
Injunctions
 §15, at 583 (2000). In Illinois, the following principles have been consistently applied by our courts:

“The act to be enjoined should be actually threatened and must be such as might be expected with reasonable certainty if not enjoined. Thus an injunction will not be granted on a mere suspicion of an intended wrong, or upon speculation or conjecture, or because there is a mere possibility or apprehension on the part of the plaintiff that some illegal act will be done.” 21A Ill. L. & Prac. 
Injunctions
 §16, at 267 (1977).

In this case, any harm suffered by the law firm as a result of the hearing is too remote and speculative to support injunctive relief.

Additionally, we note that all of the evidence in the FELA trial will be subject not only to our rules of evidence but to our rules of discovery. It is the trial judge in the FELA action who serves as the evidentiary gatekeeper in that action. Questions concerning the admission of evidence are within the purview of the trial judge. With respect to the law firm’s concerns as to discovery, we must remind the law firm that the client’s rights to discovery are his to assert, not the law firm’s. Nevertheless, our conclusion would not change were we to allow the law firm here to vindicate the rights of the client in its own name. The law firm fears that nondiscoverable information might be revealed at the hearing by Rush because the railroad would threaten Rush with termination if he did not respond. We believe, however, that once a FELA action is filed, the trial judge in that action has, by virtue of our discovery rules, a great deal of discretion in guarding against, and sanctioning, abuses of discovery. See 166 Ill. 2d R. 201. As for the fact that an employee may potentially be fired by the railroad at the hearing and his potential damages in the FELA action may thus be diminished, we note that the any impropriety in the discipline that is imposed during such a hearing is subject to appeal and federal arbitration under the terms of the collective-bargaining agreement. Rush or a representative of his union is allowed to initiate such proceedings under the terms of the collective-bargaining agreement. If a law firm suspects that a FELA litigant was wrongfully terminated during the disciplinary proceedings, the law firm can seek a stay of the FELA proceedings until the arbitration process has concluded and a final determination on the propriety of the discipline has been rendered.

The law firm states in its brief that “[t]he question to be answered is whether a railroad is entitled to question an employee, who is represented by counsel and who has filed a lawsuit against the railroad, regarding issues central to the lawsuit during the pendency of the lawsuit, while excluding the employee’s counsel from being present at the interrogation.” We are not unsympathetic to the concerns raised by the law firm and its 
amici
 in this case. We must, however, remind them that, under the terms of the collective-bargaining agreement in effect between the railroad and Rush’s union, the railroad has the right to hold disciplinary proceedings such as the one at issue in the case at bar. More importantly, the parties to the collective-bargaining agreement explicitly agreed that the hearing was to be held without attorneys present from either side. We cannot allow Rush’s attorney to do that which Rush himself cannot do. We have identified, in the proceeding paragraph, several ways in which the law firm can mitigate any potential harm caused by the disciplinary proceedings. This court has faith in the ability of both the trial judges in this state and in the federal courts to deal appropriately with the discovery and evidentiary issues which might arise under such circumstances.

CONCLUSION

In light of the above, we do not believe that the law firm made a sufficient showing of the need for injunctive relief in this case. We, therefore, hold that the circuit court abused its discretion in granting the law firm the preliminary injunction. To the extent that 
Callis I
 is inconsistent with this opinion, it is hereby overruled. The summary order of the appellate court is reversed.

Appellate court judgment reversed
.

JUSTICE KILBRIDE, specially concurring:

I concur with the majority’s decision that the parties to the collective-bargaining agreement explicitly waived the presence of attorneys at disciplinary hearings. Nevertheless, I submit this concurrence to underscore three points. First, I believe that our decision should be based upon our longstanding respect for collective-bargaining agreements. Second, we should note that this decision is limited to the facts in this particular case and that a different factual scenario may well present a sufficient claim to invoke the public policy exception to our general rule of deference to collective-bargaining agreements. Third, the trial judge in any collateral FELA proceeding must vigilantly exercise the gate-keeping role as noted by the majority.

First, our courts afford great deference to the agreed-upon terms of a collective-bargaining agreement. Generally, courts will enforce a collective-bargaining agreement unless it contains specific terms that violate public policy. See 
United Paperworkers International Union v. Misco, Inc.
, 484 U.S. 29, 42-44, 98 L. Ed. 2d 286, 301-03, 108 S. Ct. 364, 373-74 (1987) (holding that appellate court erred in finding a public policy violation); 
American Federation of State, County & Municipal Employees v. Department of Central Management Services
, 173 Ill. 2d 299, 307 (1996) (stating that a court will not enforce a collective-bargaining agreement that contradicts public policy). Here, the law firm presents no adequate public policy exception claim.

The public policy exception is narrow and invoked only when contravention of public policy is clearly demonstrated by the collective-bargaining agreement. See 
American Federation of State, County & Municipal Employees
, 173 Ill. 2d at 307. An applicable public policy concern must be explicit, well defined, dominant, and ascertained by reference to the law and legal precedent rather than general considerations of supposed public interest.
 Eastern Associated Coal Corp. v. United Mine Workers of America, District 17
, 531 U.S. 57, —, 148 L. Ed. 2d 354, 361, 121 S. Ct. 462, 467 (2000); 
American Federation of State, County & Municipal Employees v. State of Illinois
, 124 Ill. 2d 246, 261 (1988). Any public policy exception inquiry requires a fact-driven analysis. See 
American Federation of State, County & Municipal Employees
, 173 Ill. 2d at 311.

 Under certain circumstances, preservation of the attorney-client privilege and ethical considerations may require that a court alter or strike an agreement’s terms. See, 
e.g.
, 
Leoris v. Dicks
, 150 Ill. App. 3d 350, 354 (1986) (finding that fee-splitting agreement violated public policy and was therefore unenforceable). The Callis firm suggested some concerns about the attorney-client relationship, but the law firm principally argued that we should void the agreement to protect the financial interests of the law firm. The Callis firm did not, however, present sufficient factual and legal arguments to raise a public policy exception in this case. Specifically, the law firm did not demonstrate that their absence from the disciplinary hearing would in effect cause irreparable harm to the attorney-client relationship or to the firm’s ability to represent Rush. As the majority notes, mere speculation that an injury may occur is insufficient to support a claim for injunctive relief. 
HCR Ltd. Partnership I v. Behrens
, 226 Ill. App. 3d 666, 669-70 (1992). 

 Additionally, the trial judge presiding over Rush’s FELA action may exercise great discretion in addressing discovery abuses. See 166 Ill. 2d R. 201. Any discovery abuses tending to impact upon the FELA attorney-client relationship must be carefully scrutinized by the trial judge. The trial judge must assure that the disciplinary hearing does not usurp the employee’s FELA rights. If the collective-bargaining agreement can exclude attorney representation, then the disciplinary hearing’s findings and conclusions should be limited to the collective-bargaining agreement’s purpose of determining the appropriate disciplinary measure, if any, and not to impinge upon the employee’s FELA rights.

Finally, our decision does not mean, however, that an applicable public policy concern, including one based upon the attorney-client privilege or ethical considerations, could not arise under different facts.

CHIEF JUSTICE HARRISON, dissenting:

Settlement of Rush’s FELA claim against the railroad rendered this appeal moot. His law firm’s motion to dismiss the appeal should therefore have been allowed. I so voted when the motion was first presented to this court, and I continue to adhere to that view.

Even if the merits of the appeal were properly before us, I could not join in the majority’s opinion. Contrary to my colleagues, I believe that 
Callis, Papa, Jensen, Jackstadt & Halloran, P.C. v. Norfolk Southern Corp.
, 292 Ill. App. 3d 1003 (1997) (
Callis I
) was correctly decided. Under 
Callis I
, the preliminary injunction issued by the trial court in this case was plainly proper, and the judgment of the appellate court affirming the circuit court’s interlocutory order granting the preliminary injunction should be affirmed.

In reviewing the propriety of the circuit court’s preliminary injunction, there is one additional point that must be noted. The railroad’s appeal is premised on Supreme Court Rule 307(a)(1) (166 Ill. 2d R. 307(a)(1)). In such an appeal, the only question properly before the reviewing court is whether there was a sufficient showing made to the trial court to sustain its order granting or denying the interlocutory relief sought. The rule may not be used as a vehicle to determine the merits of the case. 
Postma v. Jack Brown Buick, Inc.
, 157 Ill. 2d 391, 399 (1993).

Whether a preliminary injunction should have been granted or denied was a matter for the trial court’s sound discretion. A reviewing court will not disturb the trial court’s decision absent a clear abuse of that discretion. 
Desnick v. Department of Professional Regulation
, 171 Ill. 2d 510, 516 (1996). No abuse of discretion will be found if the trial court had a legal basis for granting the injunction. See 
Murges v. Bowman
, 275 Ill. App. 3d 153, 159 (1995).

The trial court in this case clearly had a legal basis for ruling as it did. Its decision was mandated by 
Callis I.
 
Callis I
 was binding on the circuit court, and it had no alternative but to adhere to that precedent. See 
State Farm Fire & Casualty Co. v. Yapejian
, 152 Ill. 2d 533, 539 (1992). Accordingly, the trial court cannot be said to have abused its discretion in issuing the preliminary injunction.

Where, as here, a preliminary injunction is proper at the time it is issued, its validity is not subject to attack based on subsequent changes in the facts or the law. See 
Field v. Field
, 79 Ill. App. 2d 355, 359 (1967). That does not mean, however, that the preliminary injunction is unchangeable. An injunction may always be modified or dissolved, 
as to its prospective effect
, where equity no longer justifies a continuance of the injunction or the court finds that the law has changed. 
Benson v. Isaacs
, 22 Ill. 2d 606, 609 (1961). That is so whether the change in the law is based on legislative action or judicial decision. 
Material Service Corp. v. Hollingsworth
, 415 Ill. 284, 288 (1953). If my colleagues believe that 
Callis I
 is no longer good law, the appropriate course of action, therefore, is for them to vacate the preliminary injunction and to declare that the rule in 
Callis I
 will not be followed in the future.

FOOTNOTES
1:     
1
After this suit was filed, the original defendant, Norfolk and Western Railway Company, merged into its parent corporation, Norfolk Southern Railway Company, and ceased its separate corporate existence.

2:     
2
Rush v. Norfolk and Western Ry. Co. 
et al.
, No. 98– L–687 (Madison Co. Cir. Ct.).